UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JAMES HOOVER,

     Plaintiff,

v.                                                  Case No.:  2:23-cv-1124-SPC-NPM

MASCOLO MILLER and DAKOTA
CARDENAS,

     Defendants.

_____/

## OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment.  (Doc.

44).  Plaintiff did not respond, so the Court treats the motion as unopposed.

*See* Local Rule 3.01(d).  For the reasons below, the Court grants the motion.

### Background

Plaintiff James Hoover is an involuntarily committed resident of the

Florida Civil Commitment Center (FCCC).  He sues Lieutenant Mascolo Miller

and Captain Dakota Cardenas, alleging that they failed to address unsanitary

conditions in his cell and used excessive force while transferring him to a

different unit.[1]  (Doc. 21 at 5-7).

To support their summary judgment motion, Defendants submitted

sworn affidavits and FCCC records.  (Doc. 44).  The day after the motion was

---

[1] As discussed below, Miller passed away after this action was filed.

filed, the Court warned Hoover that "all properly supported material facts submitted by [Defendants] will be considered admitted by you unless you file proper evidentiary materials like affidavits, depositions, and exhibits in opposition." (Doc. 45 at 2). Hoover filed nothing in response. So the Court deems admitted all properly supported facts in Defendants' motion. Additionally, the operative complaint was not sworn under oath, and Hoover never verified that its allegations were true under penalty of perjury. (Doc. 21). Therefore, those allegations cannot be considered on summary judgment. *See Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) ("Unsworn statements . . . cannot be considered by a district court in ruling on a summary judgment motion."); *see also Roy v. Ivy*, 53 F.4th 1338, 1348 (11th Cir. 2022) (noting that "an unsworn statement" cannot "substitute for a sworn affidavit" unless the declarant "subscribe[s] its content as 'true' . . . under 'penalty of perjury'").

With this context in mind, the Court recounts the facts relevant to Hoover's claims. On the morning of March 15, 2023, Hoover told Nurse Mary Byrd that he had not slept in three days and was suicidal. (Doc. 44-7). Although Hoover had "no plan of action for self-harm," Byrd decided to place him on "close observation status." (Doc. 44-4 at 2). He was sent to an observation cell until "clinical staff" could assess him. (*Id.*) Later that day, Dr.

Melanie Mercado visited Hoover in his cell.  (Doc. 44-9).  He expressed "vague suicidal ideation," so she decided to keep him on close-observation status. (*Id.*)

Hoover stayed in the observation cell from March 15 to March 17.  (Doc. 44-1 at 4).  A Resident Treatment Assistant (RTA) checked on him every fifteen minutes, and his cell was cleaned every day.  (*Id.* at 3; Doc. 44-5 at 2-3; Doc. 44-6 at 2-3).  The cell had a working toilet, but the sink was broken.  (Doc. 44-1 at 3-4).  If Hoover wanted to "wash his hands, brush his teeth[,] or wash his face," he could ask an RTA to take him to a sink "directly next to" his cell.  (*Id.* at 4).  Likewise, if Hoover wanted drinking water, an RTA would bring it to him from the "water cooler."  (Doc. 44-5 at 3).

The cell lacked toilet paper.  (Doc. 44-1 at 3).  In the past, some residents on close-observation status had used toilet paper "to cover [their cell] window." (*Id.*)  This presented a "safety concern" because RTAs needed to monitor close-observation residents "at all times due to concerns of self-harm."  (*Id.*)  If Hoover needed toilet paper, he could get it from an RTA.  (*Id.*; Doc. 44-5 at 4). Hoover knew RTAs could provide toilet paper, escort him to the nearby sink, and give him clean drinking water.  (Doc. 44-5 at 4).  But he did not "voice any concerns" about "lack of supplies" while on close-observation status.  (*Id.* at 3; Doc. 44-6 at 3).

The RTAs who monitored Hoover during this time—Veronica Rooks and Gladstone Beadle—did not "observe any unhygienic" conditions in his cell.

3

(Doc. 44-5 at 3; Doc. 44-6 at 3). Indeed, Hoover "displayed good hygiene," showering once on March 15 and another time the next day. (Doc. 44-5 at 3; Doc. 44-6 at 3-4). Cardenas, a shift supervisor who "made rounds" in Hoover's unit, likewise stated that "he did not observe any unsanitary conditions in [ ] Hoover's room . . . between March 15 and March 17." (Doc. 44-1 at 2, 4).

Hoover was allowed to eat only "finger foods" in the observation cell. (Doc. 21 at 6; Doc. 44-2 at 4). That is because close-observation residents were not permitted "to have forks or knives . . . due to [their] threats of self-harm." (Doc. 44-2 at 4).

On the afternoon of March 17, Serina Williams—the FCCC's Assistant Clinical Director—visited Hoover in his cell. (*Id.* at 2, 4). Cardenas and Miller were present as well. (*Id.* at 5). Hoover "denied suicidal ideations" but said he "was hearing voices telling him to kill people." (*Id.* at 4). Williams decided to keep Hoover on close-observation status and move him to an "observation room" in a different unit. (*Id.* at 4-5).

After learning of the transfer, Hoover told Cardenas that "he would shove . . . Cardenas's eyeglasses in his eyes and cut them out if he came any closer." (*Id.* at 5). Hoover also said "he would bash . . . Cardenas in the face if he touched" him. (*Id.*) Cardenas gave Hoover "three verbal orders" to "stand up and place his hands behind his back." (Doc. 44-1 at 5-6). Hoover refused to comply, putting his hands together and "tuck[ing] them underneath himself"

4

on the bed. (*Id.* at 6). Cardenas tried to handcuff Hoover by grabbing his right forearm, but Hoover kept resisting. (*Id.*) Cardenas then brought Hoover to the ground, where he was finally able to handcuff him. (*Id.*) Hoover was escorted to the observation room without further incident. (*Id.*) He suffered no injuries from the use of force, nor did he complain of any injuries to FCCC staff. (*Id.*)

Hoover was ultimately released from close-observation status on March 22. (Doc. 44-20 at 2). On that day, he denied suicidal or homicidal ideations, "reported eating well and taking his medications as prescribed," and was "cooperative and respectful in his interactions." (*Id.*)

## Legal Standard

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden falls on the movant, who must identify the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat summary judgment, the non-movant must "go beyond the

pleadings, and present affirmative evidence to show that a genuine issue of material facts exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences drawn from it in the light most favorable to the non-movant. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). But "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). If the moving party demonstrates entitlement to judgment as a matter of law, the non-moving party must establish each essential element of that party's case. *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir. 1994).

Hoover seeks relief under 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must allege that (1) the defendant deprived him of a right secured under the Constitution or federal law, and (2) the deprivation occurred under color of state law. *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (citing *Arrington v. Cobb Cty.*, 139 F.3d 865, 872 (11th Cir. 1998)). In addition, a plaintiff must allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation. *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1059 (11th Cir. 2001).

## Discussion

### A.    Deceased Defendant

On January 24, 2025, defense counsel filed a Suggestion of Death indicating that Miller had passed away. (Doc. 38).  Under Federal Rule of Civil Procedure 25(a)(1), if a motion to substitute a deceased party "is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed."  Over a year has passed since the Suggestion of Death was filed, but Hoover has not moved to substitute a proper party.  Nor has he sought an extension of time to do so.  *See Lizarazo v. Miami-Dade Corr. & Rehab. Dep't*, 878 F.3d 1008, 1011-12 (11th Cir. 2017) (noting that "courts have the discretion to extend the ninety-day deadline" upon a showing of "excusable neglect").  Thus, Miller must be dismissed from this action.

### B.    Conditions of Confinement

That leaves Cardenas as the sole remaining defendant.  In an abundance of caution, the Court considers whether both Cardenas and Miller are entitled to summary judgment on the merits of Hoover's claims.  Hoover seeks to hold Defendants liable for the allegedly unsanitary conditions in the observation cell from March 15 to March 17. (Doc. 21 at 5-7).  In his operative complaint, Hoover alleges that (1) the toilet was broken and he had no toilet paper; (2) he was "forced to use [his] bare hands to wipe himself" after defecating; (3)

7

Defendants denied his requests for "drinking water," "diapers," a "change of soiled clothes," and a mattress cleaning; (4) he was "forced to eat finger food while feces in the toilet were emitting toxic fumes"; and (5) Defendants refused to let him shower. (Doc. 21 at 5-6).

As explained above, Hoover's "unsworn statement[s]" cannot be "consider[ed] in determining the propriety of summary judgment." *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980). And despite the Court's warning that he "may not rely solely on allegations in the unverified pleadings," Hoover presented no evidence to support his conditions-of-confinement claim. (Doc. 45 at 2). By contrast, Defendants submitted affidavits and FCCC records refuting Hoover's allegations of unsanitary conditions. (Doc. 44). Because that evidence is undisputed, Defendants are entitled to summary judgment on the conditions-of-confinement claim.

As a civilly committed FCCC resident, Hoover is "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). Under the Fourteenth Amendment, the civilly committed enjoy a substantive-due-process right to "safety" as well as "adequate food, shelter, [and] clothing." *Youngberg*, 457 U.S. at 324; *Bilal v. Geo Care, LLC*, 981 F.3d 903, 912 (11th Cir. 2020). But these rights "are not absolute." *Youngberg*, 457 U.S. at 319-20. The Constitution requires only that

"professional judgment in fact was exercised" in setting the conditions of confinement. *Id.* at 321. Thus, "decisions made by professionals employed by civil-commitment centers are presumptively valid; liability attaches only when the decision represents such a substantial departure from accepted professional judgment, practice, or standards that it shows that the employee did not, in fact, make the decision based on sound professional judgment." *Bilal*, 981 F.3d at 912.

Hoover is not a prisoner serving a term of incarceration. "But Fourteenth Amendment substantive-due-process rights are at least equivalent to the comparable Eighth Amendment rights of those incarcerated." *Id.* So "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." *Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir. 1996); *see also Nealy v. Masters*, No. 24-13002, 2025 WL 3297835, at *1-2 (11th Cir. Nov. 26, 2025) (noting that, while the rights of civilly committed residents "are at least equivalent to the comparable Eighth Amendment rights of those incarcerated," courts must "appl[y] the professional judgment standard" to their claims).

No reasonable jury could find that Defendants violated Hoover's Fourteenth Amendment rights. First, Hoover fails to create a genuine dispute as to the toilet in his observation cell. According to the undisputed evidence, the toilet was working and Hoover "would have been able to flush [it] at any

time." (Doc. 44-1 at 4). True, the cell lacked toilet paper, but FCCC staff imposed that restriction because close-observation residents had previously used toilet paper "to cover [their cell] window." (*Id.* at 3). That made it difficult for the RTAs to monitor residents—an important concern given the risk of "self-harm." (*Id.*) Moreover, Hoover knew that if he needed toilet paper, he could get it from an RTA. (*Id.*; Doc. 44-5 at 4). Yet he never "voice[d] any concerns" to the RTAs about "lack of supplies" while on close-observation status. (Doc. 44-5 at 3; Doc. 44-6 at 3). And neither the RTAs nor Cardenas "observe[d] any unhygienic" conditions in the cell. (Doc. 44-1 at 4; Doc. 44-5 at 3; Doc. 44-6 at 3). Thus, nothing in the record suggests that the toilet-related conditions reflected an absence of "adequate professional judgment." *Hall v. Masters*, No. 24-11879, 2025 WL 3089921, at *3 (11th Cir. Nov. 5, 2025).

Second, Hoover fails to create a genuine dispute as to his alleged requests for "drinking water," "diapers," a "change of soiled clothes," and a mattress cleaning. (Doc. 21 at 6). The sink in the cell was broken, but Hoover knew he could ask the RTAs for drinking water. (Doc. 44-1 at 4; Doc. 44-5 at 3). Moreover, Hoover never "voice[d] any concerns" about "lack of supplies," the RTAs and Cardenas saw nothing unsanitary in his cell, and the RTAs state that he "displayed good hygiene." (Doc. 44-1 at 4; Doc. 44-5 at 3; Doc. 44-6 at 3). Hoover offers no evidence to rebut this testimony. Therefore, no reasonable jury could find that the relevant conditions represented "a

substantial departure from accepted professional judgment, practice, or standards." *Bilal*, 981 F.3d at 912; *see also Hamlet v. Martin Corr. Inst.*, No. 21-11937, 2022 WL 16827438, at *5 (11th Cir. Nov. 9, 2022) (correctional official "could not be subjectively culpable for creating conditions of which he was completely unaware").

Third, there is no triable issue as to Hoover's allegation that he was "forced to eat finger food while feces in the toilet were emitting toxic fumes." (Doc. 21 at 6). Again, the undisputed evidence is that the toilet was operational during Hoover's stay in the observation cell. (Doc. 44-1 at 4). And while Hoover was limited to finger foods, that restriction rested on "sound professional judgment." *Bilal*, 981 F.3d at 912. Specifically, close-observation residents could not "have forks or knives . . . due to [their] threats of self-harm." (Doc. 44-2 at 4). On this record, no reasonable jury could find "a substantial departure from accepted professional judgment, practice, or standards."[2] *Bilal*, 981 F.3d at 912.

Finally, Hoover fails to create a factual dispute as to the alleged denial of showers. (Doc. 21 at 6). The record establishes that Hoover showered at least twice during his three-day stay in the observation cell—once on March 15 and once on March 16. (Doc. 44-5 at 3; Doc. 44-6 at 4). And the RTAs state

---

[2] Hoover does not allege—and nothing in the record suggests—that the finger foods were nutritionally inadequate.

that Hoover "displayed good hygiene" while on close-observation status. (Doc. 44-5 at 3; Doc. 44-6 at 3). No reasonable jury could find that two showers in three days violated Hoover's right to adequate hygiene.[3] *See Ellis v. Pierce Cty.*, 415 F. App'x 215, 218 (11th Cir. 2011) (no constitutional violation where prisoner "usually had to wait only three to four days for a shower"); *Fischer v. Ellegood*, 238 F. App'x 428, 433 (11th Cir. 2007) (denial of showers for "five days" did not violate Eighth Amendment).

## C.    Excessive Force

Hoover alleges that, during his transfer from the observation cell, Defendants used excessive force against him. (Doc. 21 at 7). According to the operative complaint, Hoover "complied" with Defendants' instructions, but they "slammed him on to the ground" for no reason. (*Id.*) Again, these unsworn allegations cannot defeat summary judgment. *Carr*, 338 F.3d at 1273 n.26. As explained below, the undisputed evidence establishes that Defendants did not violate Hoover's right to be free from excessive force.

The Fourteenth Amendment governs Hoover's excessive-force claim. *See Perez v. Wicker*, No. 2:14-cv-558-JES-CM, 2016 WL 3543502, at *3 (M.D. Fla.

---

[3] Hoover alleges that he "was forced to deal with rashes and other skin irritations" while on close-observation status. (Doc. 21 at 6). But there is no evidence that Defendants knew (or should have known) of these alleged issues. So no reasonable jury could find "an affirmative causal connection between" Defendants' conduct and any "alleged constitutional deprivation" related to Hoover's skin issues. *Coley-Pearson v. Martin*, 156 F.4th 1133, 1141 (11th Cir. 2025).

12

June 29, 2016) (applying Fourteenth Amendment to "claim[] of excessive force against a civilly committed detainee"). To establish his claim, Hoover "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "Force is excessive if it is not rationally related to a legitimate nonpunitive governmental purpose or if it appears excessive in relation to that purpose." *United States v. Hill*, 99 F.4th 1289, 1302 (11th Cir. 2024) (cleaned up). "[L]egitimate interests—including the need to preserve internal order and discipline and maintain institutional security—may at times require . . . officers to use force." *Piazza v. Jefferson Cty.*, 923 F.3d 947, 953 (11th Cir. 2019) (cleaned up).

The incident began on the afternoon of March 17, when Williams—the FCCC's Assistant Clinical Director—told Hoover in his cell that he was being transferred to an "observation room" in a different unit. (Doc. 44-2 at 4-5). Cardenas and Miller were present as well. (*Id.* at 5). Hoover told Cardenas that "he would shove . . . Cardenas's eyeglasses in his eyes and cut them out if he came any closer." (*Id.*) He also threatened to "bash . . . Cardenas in the face if he touched" him. (*Id.*) Cardenas ordered Hoover three times to "stand up and place his hands behind his back." (Doc. 44-1 at 5-6). Hoover refused, putting his hands together and "tuck[ing] them underneath himself" on the bed. (*Id.* at 6). Cardenas unsuccessfully tried to handcuff Hoover by grabbing

his right forearm. (*Id.*) Cardenas then took Hoover to the ground and placed handcuffs on him. (*Id.*) Hoover suffered no injuries from the use of force, nor did he complain of any injuries to FCCC staff. (*Id.*)

No reasonable jury could find Defendants liable for excessive force. As an initial matter, "no evidence suggests [Miller] participated in the use of force." *Barnett v. City of Florence*, 409 F. App'x 266, 269 n.2 (11th Cir. 2010). That is fatal to the claim against him. *See id.* (affirming dismissal of excessive-force claim against officer who played no role in use of force).

Cardenas admits to using force against Hoover, but the undisputed evidence establishes that he "was warranted in using force given [Hoover's] repeated refusal to obey commands." *Robinson v. Lambert*, 753 F. App'x 777, 780 (11th Cir. 2018). The use of force was also justified in light of Hoover's threats to cut out Cardenas's eyes and bash him in the face. *See Kingsley*, 576 U.S. at 397 (holding that "the threat reasonably perceived by the officer" is "potentially relevant to a determination of excessive force"). Moreover, the amount of force used—bringing Hoover to the ground before handcuffing him— was an "objectively reasonable" response to his threats and disobedience. *Lombardo v. City of St. Louis*, 594 U.S. 464, 466 (2021); *see also Robinson*, 753 F. App'x at 780 (prison official responded reasonably to plaintiff's "repeated refusal to obey commands" by "pulling [him] from his bunk and slamming him against the wall"). Finally, Hoover suffered no injuries during the incident.

14

(Doc. 44-1 at 6). That is not dispositive, but it does suggest that Cardenas's use of force was reasonable. *See Kingsley*, 576 U.S. at 397 (instructing courts to consider "the extent of the plaintiff's injury" when evaluating excessive-force claims).

Viewing the undisputed facts in the light most favorable to Hoover, no rational jury could conclude that Cardenas's use of force was "objectively unreasonable."[4] *Kingsley*, 576 U.S. at 397.

Accordingly, it is

**ORDERED:**

Defendants' Motion for Summary Judgment (Doc. 44) is **GRANTED**. This action is **DISMISSED with prejudice**. The Clerk is **DIRECTED** to terminate any pending motions and deadlines, enter judgment, and close this case.

**DONE** and **ORDERED** in Fort Myers, Florida on March 10, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

SA: TpaP-2
Copies: All Parties of Record

---

[4] To the extent that Hoover seeks to hold Miller liable for failing to intervene in Cardenas's use of force, the claim fails because Cardenas did not violate Hoover's right to be free from excessive force. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed.").